# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FRIENDFINDER NETWORKS INC. )
AND VARIOUS, INC., )
                        )
          Plaintiffs, )
                        )
           v. )      C.A. No. 12436-VCMR
                        )
PENTHOUSE GLOBAL MEDIA, )
INC., )
                        )
          Defendant. )

## MEMORANDUM OPINION

Date Submitted: February 14, 2017
Date Decided: May 26, 2017

Robert W. Whetzel, Steven J. Fineman, Jason J. Rawnsley, and Selena E. Molina, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Plaintiffs.*

Stephen B. Brauerman and Sara E. Bussiere, BAYARD, PA, Wilmington, Delaware; *Attorneys for Defendant.*

**MONTGOMERY-REEVES, Vice Chancellor.**

This dispute results from a transaction between two companies in the adult entertainment and dating industry. As part of the transaction, various adult website domain names transferred ownership. The transaction's governing stock purchase agreement did not list which domain names were to be transferred at closing. Rather, the parties, through various negotiations before the transaction, agreed to identify and transfer the relevant domains after closing. After the closing, the parties exchanged lists of domain names, and ultimately, the seller transferred and the buyer accepted over 1000 domain names.

The seller now sues, claiming nine of those domains still belong to seller and were wrongfully transferred as part of the transaction. The seller argues that the contract delineated only the intellectual property that was associated with, used in, or material to the business of the buyer at the time of closing, and the nine domains are not included in that category. The buyer, on the other hand, argues that the parties entered into two separate contracts regarding the domains, and the nine domains were appropriately transferred under those agreements. As discussed below, I find that the stock purchase agreement provides an unambiguous standard for the identification of the domain names, and the parties operated under this agreement. The buyer is entitled to domain names associated with, used in, or material to its business at the time of closing, and the buyer has not presented evidence to show that the disputed domains fall under this category.

## I. BACKGROUND

These are my findings of fact based on the parties' stipulations, over 300 exhibits, and the testimony of nine witnesses during a three-day trial. I accord the evidence the weight and credibility I find it deserves.[1]

### A. Parties and Relevant Non-Parties

Plaintiff FriendFinder Networks Inc. ("FriendFinder") is a social networking, online dating, and video-sharing services company that provides video chat, recorded video, online chat rooms, webcams, instant messaging, photo and video sharing, and premium content.[2] FriendFinder has over 700 million members around the world.[3] Plaintiff Various, Inc. ("Various") is a wholly-owned subsidiary that operates the dating and video-sharing businesses of FriendFinder.[4]

Jon Buckheit has been FriendFinder's Chief Executive Officer since August 2015 and a member of its board since early 2015.[5] Ezra Shashoua joined Penthouse

---

[1] Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text. Exhibits are cited as "JTX #," and facts drawn from the parties' Joint Pre-Trial Stipulation and Order are cited as "PTO ¶ #." Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs.

[2] FriendFinder Networks, Who We Are, http://www.ffn.com/#about (last visited January 25, 2017).

[3] *Id.*; Tr. 9-10 (Buckheit).

[4] JTX 339; Tr. 17 (Buckheit).

[5] Tr. 5, 56-57 (Buckheit).

3

Media Group, Inc. ("PMGI") in 2007 before its initial merger with Various later that year; Shashoua became the Chief Financial Officer of FriendFinder on January 1, 2008.[6] Shashoua left FriendFinder in July 2014, returned in September 2015, and represented FriendFinder in the negotiations at issue here.[7] Shashoua is also a member of FriendFinder's board. Diana Ballou is Vice President and Senior Counsel at FriendFinder and is the in-house attorney "principally responsible" for the transaction.[8]

Defendant Penthouse Global Media Group, Inc. ("Penthouse") is an adult "entertainment and media firm" with four business units—publishing, broadcast, digital media, and licensing.[9] Kelly Holland is the owner and Chief Executive Officer of Penthouse.[10] Donald Slaughter is the Chief Operating Officer of Penthouse and oversaw its performance under various agreements with FriendFinder.[11] Tom Fox is the Chief Technology Officer of Penthouse and served as Vice President of information technology at FriendFinder prior to the

---

[6]    *Id.* at 118-19 (Shashoua), 476-77 (Holland); PTO ¶¶ 6-8.

[7]    *Id.* at 119-20 (Shashoua), 25 (Buckheit).

[8]    *Id.* at 241 (Ballou), 25 (Buckheit).

[9]    JTX 143; JTX 186; Tr. 461 (Holland).

[10]   Tr. at 464-67 (Holland).

[11]   *Id.* at 790-91 (Slaughter).

4

transaction.[12]  Relani Belous is Penthouse's General Counsel and served as Senior Counsel and Vice President of FriendFinder prior to the transaction.[13]

## B.     Facts

### 1.     The businesses prior to the transaction

Penthouse magazine was founded in 1965 by Bob Guccione and grew into a well-known brand worldwide.  In 2007, PMGI acquired Various, and afterwards the entire business was held by the newly created entity, FriendFinder.[14]  Prior to the transaction at issue, FriendFinder consisted of three business units: dating, cams, and entertainment.[15]  The dating business was located in Silicon Valley, California and comprised a "series of dating websites for various proclivities of individuals."[16]  This included the dating website FriendFinder.com, which catered to the mainstream population and offered online communities for various cultures, religions, and interest groups.[17]

---

[12]     *Id.* at 706 (Fox).

[13]     *Id.* at 634, 660 (Belous).

[14]     *Id.* at 476-77 (Holland); PTO ¶¶ 6-8.

[15]     Tr. 10, 61 (Buckheit).

[16]     *Id.* at 10 (Buckheit).

[17]     *Id.* at 10-11 (Buckheit); JTX 116.

As part of its dating business, FriendFinder also ran AdultFriendFinder, a member-based adult dating and social networking platform on which a user may view another's profile for free but must pay to communicate with other users.[18] FriendFinder also maintained "co-brands," which are websites that contain different "themes" targeted at particular interests. Although the theme for each co-brand differed, each allowed users to view profiles throughout the AdultFriendFinder database and the other co-brands.[19] As part of this design, the co-brands had different pages one saw when he or she loaded the website prior to login ("Splash Pages"), but the co-brands shared the same layout and structure after login.[20] FriendFinder also engaged affiliates—websites that placed a link to one of the co-brand websites on their page—to direct traffic to the AdultFriendFinder network websites.[21] In return, the affiliates received a portion of any subsequent subscription fee.

The cams business, also located in Silicon Valley and operated by a subsidiary called Streamray, Inc. ("Streamray"), offered live, pay-per-view broadcasts through

---

[18]    Tr. 123-24 (Shashoua).

[19]    *Id.* at 124-25 (Shashoua), 11-12 (Buckheit).

[20]    *Id.* at 397-99 (Palage); JTX 68; JTX 334 ¶¶ 62-66.

[21]    Tr. 12-13 (Buckheit), 126-27 (Shashoua).

6

which customers could interact with models on a video feed.[22] Cams.com was the main website for this business.[23]

The third business unit was the Penthouse entertainment business, which was located in New York and Los Angeles.[24] This business consisted of broadcasting, publishing, licensing, and online paysites.[25] It relied on professionally generated content, rather than the user-generated content hosted by the dating and cams businesses.[26] The three business units shared operations, including executive management and assets, and shared legal, accounting, and technology departments.[27] The technology department used the same data center, network provider, and staff for all three business units.[28]

### 2. The domains before the transaction

At trial, FriendFinder's expert, Michael D. Palage, a domain name registration consultant, testified as to how website and domain name ownership is monitored.

---

[22]     *Id.* at 13-15 (Buckheit).

[23]     *Id.* at 14-15 (Buckheit).

[24]     *Id.* at 14-15 (Buckheit).

[25]     *Id.* at 122 (Shashoua), 14-15 (Buckheit).

[26]     *Id.*

[27]     *Id.* at 178, 187, 193-94 (Shashoua).

[28]     *Id.* at 708 (Fox).

According to Palage, domain names are essentially short-hand, intuitive identifiers—i.e. Facebook.com, Google.com—for a website's IP address.[29] Because of domain names, users do not have to remember the complex, numerical IP addresses of websites.[30] Domain names are registered on "name servers," which essentially act as telephone directories for website domain names.[31] Name servers can be hosted by an individual or a third-party service.[32] A registrar helps a person or entity register a domain name.[33] Well-known registrars include GoDaddy, NetworkSolutions, and CSC.[34] If the registrar finds that the domain name is available, it will collect information on the owner, known as a registrant.[35] The registrar then stores the contact information of the registrant and makes certain information publicly available.[36] This data is available through the WhoIs service,

---

[29]     *Id.* at 380-83 (Palage).

[30]     *Id.* at 381 (Palage).

[31]     *Id.* at 382-83 (Palage).

[32]     *Id.* at 382 (Palage).

[33]     *Id.* at 385-87 (Palage).

[34]     *Id.* at 386 (Palage).

[35]     *Id.* at 387 (Palage).

[36]     *Id.* at 387-88 (Palage).

8

which contains a searchable database of registration information for domain names.[37]

Palage testified that WhoIs information is not always accurate because of illegal "cybersquatting" and registrants' delay in updating their registration information when it changes.[38] Thus, Palage uses multiple "indicia" to subjectively determine the ownership of a domain.[39] This includes WhoIs current and historical data, the current and historical use of the domain, financial data such as costs and revenue associated with the domain, and any transactional records.[40]

There are nine website domains in dispute in this case: hornywife.com, bookofsex.com, photobookofsex.com, photogalleryofsex.com, nakedwithfood.com, nakedfemalebodybuilder.com, boobfarm.com, boob-squad.us, and missblizz.com (collectively, the "Disputed Domains").[41] All of the Disputed Domains were registered through GoDaddy, and eight of the nine domains were maintained in a "penthouse2010" GoDaddy account prior to the transaction.[42]

---

[37]   *Id.* at 388-90 (Palage).

[38]   *Id.* at 391 (Palage).

[39]   *Id.* at 394-96 (Palage).

[40]   *Id*.

[41]   Compl. ¶ 1 n.1.

[42]   Tr. 413-14 (Palage), 716 (Fox).

### a.      Hornywife

The earliest WhoIs record for hornywife is from 2001, and it shows the registrant as GMCI Internet Operations, Inc. ("GMCI"), with a New York address.[43] GMCI is a Penthouse-associated business.  Using a Wayback Machine[44] search, Palage found that from 2005 to 2011, the hornywife website was automatically redirected to penthouse.com.[45]  By November 2011, the registrant for the hornywife domain changed to Various, with a California address, and the name servers were switched from Penthouse servers to Various servers.[46]

Hornywife.com became an AdultFriendFinder co-brand on September 14, 2011.[47]  Hornywife's Splash Page lists Various as the copyright owner.[48]  In September 2011, Various's accounting records reflected revenue from this domain for the first time, and since then, Various paid affiliates, incurred advertising costs,

---

[43]      JTX 334 ¶ 71-73.

[44]      The Wayback Machine is a tool commonly used in the industry to establish the existence of specific information available at a given website on a given date.  JTX 334 ¶ 59.

[45]      JTX 334 ¶ 85.

[46]      Tr. 400-01 (Palage); JTX 334 ¶¶ 79-81.

[47]      Tr. 137-38 (Shashoua), 401-02 (Palage); JTX 62.

[48]      Tr. 137-38 (Shashoua), 401-02 (Palage); JTX 62.

promoted the website among affiliates, paid to purchase keywords for search engine optimization, and recognized revenue from the domain.[49]

### b. Bookofsex

In 2011, Facebook sued FriendFinder for using the domain facebookofsex.com as a dating website.[50] In response, FriendFinder purchased bookofsex.com in April 2011 from worldwide media, inc., which had been listed as the registrant since 2005.[51] FriendFinder developed bookofsex.com to use as a co-brand for AdultFriendFinder.[52] In May 2011, the registrant changed to Matthew Schmitt at GMCI, and the name servers changed to FriendFinder name servers.[53] In August 2011, the bookofsex registrant information changed from GMCI to Various.[54]

Various has paid for affiliates, advertising, and search engine optimization for bookofsex.com, and it has recognized revenue for the website since 2011.[55] Prior to

---

[49] JTX 6; Tr. 155, 161 (Shashoua), 398 (Palage).

[50] Tr. 139 (Shashoua).

[51] JTX 46; JTX 334 ¶ 93; Tr. 139, 142-44 (Shashoua).

[52] JTX 46; JTX 334 ¶ 93; Tr. 139, 142-44 (Shashoua).

[53] JTX 334 ¶ 95; Tr. 404 (Palage).

[54] JTX 334 ¶ 98.

[55] JTX 5; Tr. 125-26, 144, 162-63 (Shashoua), 404 (Palage).

June 2011, the domain was primarily used as a "link farm" for other domains offering adult content.[56] In June 2011, the website changed to contain the bookofsex logo, and the copyright and terms of use have identified Various as the owner since that time.[57] In November of 2011, the website changed to the design that currently is visible, and it was maintained as an AdultFriendFinder co-brand until the time of the transaction at issue.[58]

### c.    The inactive websites

On May 3, 2011, after the Facebook litigation, the domains photobookofsex and photogalleryofsex were created.[59] They originally were registered to FriendFinder but were transferred to Various in 2013.[60] There has been no recorded website activity at these domains, and the name servers have been FriendFinder name servers since 2011.[61]

---

[56]    JTX 334 ¶ 103.

[57]    *Id.* ¶ 105; Tr. 403-04 (Palage).

[58]    JTX 334 ¶¶ 106-07.

[59]    Tr. 144 (Shashoua), 405 (Palage); JTX 334.

[60]    Tr. 405; JTX 334.

[61]    Tr. 405-06 (Palage).

On October 27, 2009, ConfirmID, a Various subsidiary, purchased a portfolio of adult entertainment domain names for $120,000.[62] The portfolio included nakedfemalebodybuilder, nakedwithfood, boobfarm, and boob-squad.[63] Initially, these domains continued to host the previous owner's content, but all except boobfarm later became inactive.[64] Boobfarm continued to be used to direct traffic to AdultFriendFinder co-brands and other FriendFinder websites.[65] From 2012 until the close of the transaction at issue, these domains were all registered to ConfirmID.[66]

Missblizz was registered to Anthony Previte, the Chief Operating Officer of FriendFinder in 2011.[67] The registrant was transferred to a default "Host Master" account associated with FriendFinder on November 10, 2014.[68] The domain has not been active since around 2012.[69]

---

[62]     JTX 28; JTX 29; Tr. 145-46 (Shashoua), 407 (Palage).

[63]     Tr. 146-47 (Shashoua).

[64]     *Id.* at 407 (Palage); JTX 334.

[65]     Tr. 407-08; JTX 334 ¶¶ 118-21.

[66]     Tr. 406-07; JTX 4; JTX 334.

[67]     Tr. 134 (Shashoua), 408 (Palage); JTX 334.

[68]     Tr. 408-09 (Palage); JTX 334.

[69]     Tr. 409 (Palage); JTX 334.

### d. The "silo" system

In 2012, FriendFinder began an accounting initiative to properly allocate expenses and revenues to the appropriate entities and business units.[70] To aid in this transition and to give employees an understanding of how to attribute revenue and costs, managers and executives, including Holland, Fox, and Belous, received a "Coding Cheat Sheet," which divides FriendFinder's internet assets into "silos."[71] The "Casual Dating Silo" includes hornywife and bookofsex, among others, grouped under AdultFriendFinder.[72] The attributed company for the Casual Dating Silo is listed as Various.[73] The "Paysite Silo" includes websites like penthouse.com, danni.com, dammo.com, and hotbox.com.[74] The attributed companies for the Paysite Silo are listed as GMCI, Danni Ashe, Inc., and Tan Door Media Inc.—all Penthouse-associated companies.[75] No Disputed Domains or dating websites are listed in the Paysite Silo.[76] The last page of the cheat sheet includes a list of "Domain

---

[70] JTX 76; Tr. 149-51 (Shashoua), 594-95 (Holland).

[71] JTX 76; JTX 77; Tr. 152, 154 (Shashoua), 665-67 (Belous); Holland Dep. 235.

[72] JTX 76; Tr. 154-56 (Shashoua).

[73] JTX 76; Tr. 154-56 (Shashoua), 596-97 (Holland).

[74] JTX 76.

[75] *Id.*; Tr. 158 (Shashoua).

[76] Tr. 159 (Shashoua).

Names & Back-end Acronyms," which lists hornywife and bookofsex with the "Ffadult" back-end acronym, meaning AdultFriendFinder, as opposed to "Ph" for Penthouse.[77]

### 3. FriendFinder prepares to sell Penthouse

In 2014, FriendFinder began exploring the possibility of selling the Penthouse business because Penthouse did not fit within FriendFinder's "core business" and was losing money.[78] FriendFinder engaged SSG Advisors, LLC ("SSG"), an investment banker, to prepare a confidential information memorandum (the "Memorandum") to market Penthouse.[79] The Memorandum provides a description of the Penthouse online business, which includes penthouse.com, danni.com, hotbox.com, and dammo.com, biographies of Holland and Belous, and a chart identifying the Penthouse-associated subsidiaries for sale (the "Acquired Companies").[80]

---

[77] *Id.*

[78] Tr. 23 (Buckheit), 164 (Shashoua).

[79] JTX 113; Tr. 164-65 (Shashoua).

[80] JTX 113. The Acquired Companies are: Danni Ashe, Inc.; GMCI Internet Operations, Inc.; GMI On-Line Ventures, Ltd.; General Media Communications, Inc.; General Media Entertainment, Inc.; Great Ganilly Enterprise, Ltd.; NAFT Media, S.L.; Network Domain Services N.V.; PMGI Holdings Inc.; Penthouse Clubs International Establishment; Penthouse Digital Media Productions Inc.; Penthouse Images Acquisitions, Ltd.; Pure Entertainment Telecommunications, Inc.; Streamray Studios, Inc.; Tan Door Media Inc.; and XVHUB Group Inc. PTO ¶ 11.

15

FriendFinder established a data room called the "Smart Room" to allow prospective buyers access to documents associated with the Penthouse business.[81] Ballou and her assistant uploaded documents to the Smart Room.[82] On June 12, 2014, Holland asked Fox to create a list of domains owned by GMCI.[83] Fox asked Doug Canny, a FriendFinder employee, to generate this list by searching all domains containing "Penthouse," "pet," "key," "forum," "variations," and "letters," as well as "Danni's," "Hotbox," and "Dammo."[84] Canny sent these lists to Holland and Fox.[85] Ballou instructed her assistant to upload the lists to the Smart Room (the "Data Room Lists").[86] These lists included 1,074 domains, none of which were the Disputed Domains, and were represented as the list of Penthouse domains in various Penthouse and FriendFinder documents.[87] For instance, in connection with the sale,

---

[81]   Tr. 170-71, 197 (Shashoua), 249-54 (Ballou).

[82]   Tr. 251 (Ballou), 474-75 (Holland).

[83]   JTX 98.

[84]   JTX 99; JTX 101.

[85]   JTX 101.

[86]   Tr. 256-57, 319 (Ballou).

[87]   JX 113, at FFN00060555 (the Memorandum); JTX 122 (an investment overview document for prospective investors); JTX 166 (information certificates for potential investors); JTX 171, 172 (Penthouse application for media liability insurance); JTX 176 (information sent to potential Penthouse investor).

Penthouse sought to obtain errors and omissions insurance coverage.[88] On February 5, 2016, Belous sent Shashoua a draft of the application in order to allow Penthouse to obtain a post-closing insurance quote for one of the Acquired Companies, Penthouse Digital Media Productions, Inc. (the "Application").[89] On the Application, Belous submitted the Data Room Lists as the documentation of websites "for which coverage is desired."[90]

### 4.     The lead-up to the transaction

Around mid-2014, Holland began considering acquiring Penthouse. Holland felt that she could revitalize the business and assembled a team to help her with that goal. In July 2014, she engaged Hogan Lovells as legal counsel to represent her in the buyout.[91] In November 2014, she hired Noble Financial to "walk [her] through the process" of a management buyout.[92] Holland's initial efforts halted, however, when her investors backed out.[93] Unbeknownst to Holland, FriendFinder continued

---

[88]     JTX 171; Tr. 644-46 (Belous).

[89]     JTX 171.

[90]     *Id.*

[91]     Tr. 473:1-13 (Holland).

[92]     *Id.*

[93]     JTX 124; Tr. 474 (Holland).

discussions with AVN, "a big trade magazine in the business."[94]  AVN initially

worked with Holland as a financial partner for her proposed purchase of Penthouse.[95]

AVN signed a non-circumvention agreement with Holland in connection with their

potential partnership.[96]

At the same time, FriendFinder also engaged in discussions with Vert Capital

("Vert").[97]  Although Vert signed a contract to purchase Penthouse, this deal fell

through at the end of 2015.[98]  Holland got back on track and submitted a bid for

FriendFinder.[99]  Meanwhile, AVN expressed interest in purchasing Penthouse for

itself in violation of its non-circumvention agreement with Holland. Holland

eventually learned of AVN's interest through FriendFinder.  FriendFinder accepted

Holland's bid on the condition that she agree to release AVN from the non-

circumvention agreement if she could not close the deal before February 12, 2016.[100]

Although the exclusivity period expired on February 12, Holland was given an

---

[94]     Tr. 484-85 (Holland).

[95]     *Id.* at 484-86 (Holland).

[96]     *Id.*

[97]     *Id.* at 199-200 (Shashoua).

[98]     *Id.*

[99]     *Id.* at 484-86 (Holland).

[100]    *Id.* at 484-86, 492-93 (Holland).

18

extension until February 19, but FriendFinder told her they would not extend it beyond that date.[101] After that date, the magazine would miss its print deadline and lose distribution.

### 5. Pre-closing exchanges and closing

On February 15, 2016, Holland sent an e-mail to Ballou and Shashoua titled "A few random points" stating:

> The digital team was looking for a specific URL, hornywives.com, that was a Penthouse site back in the Guccione days. It shows as being registered to FFN but I can't find it on the URL list. In assembling the URL list did anyone compare it to the list of URL's that belonged to Penthouse prior to the FFN acquisition? I'm concerned that PH URLs that don't specifically have PH embedded are not easily identified.[102]

Ballou responded by telling Holland to "[p]repare a list of those URLs you believe are part of the business that are not listed and we will review asap. It's likely most if not all will be a non-issue."[103] Holland replied to Ballou, copying Shashoua, saying "Thanks."[104] Shashoua responded to Holland's original e-mail by stating "I'm sure we can straighten it out either before or after we fund if a site fell through

---

[101] JTX 149; JTX 186; Tr. 323 (Ballou), 207 (Shashoua), 492-93 (Holland).

[102] JTX 179.

[103] JTX 180.

[104] JTX 182.

19

the cracks."[105]   Holland replied to Shashoua's e-mail, copying Ballou, saying

"Agreed, no problem."[106]

Fox e-mailed Holland on February 18, 2016, stating:

> The account we want to take ownership of is the godaddy login named "penthouse2010" and the domains contained within it, AND any of the domains that you want that reside in other accounts (both at godaddy and other registrars).  If we can slide this one past Diana it will be nothing short of an awesome heist.[107]

Contrary to Fox's suggestion, Penthouse did not try to obtain the "penthouse2010" GoDaddy account.

The transaction closed on February 19, 2016 with FriendFinder and Streamray as sellers and Penthouse as buyer.[108]   Penthouse acquired the stock of sixteen subsidiaries of Friendfinder for $6,500,000.[109]  The transaction was memorialized in a Stock Purchase Agreement ("SPA"), Transition Services Agreement (the "TSA") to continue certain shared services such as FriendFinder's hosting of Penthouse's

---

[105]   JTX 181.

[106]   JTX 178.

[107]   JTX 190.

[108]   JTX 186.

[109]   *Id.*; JTX 339.

website servers,[110] and the Live Video Streaming Agreement (the "LVSA") to share revenue from the cams websites.[111]

### 6.	The SPA's relevant provisions

The SPA contains the following relevant language:

**Section 3.10 Intellectual Property**

(a)	. . . the Acquired Companies own or otherwise have the right to use all Intellectual Property that is used in, and is material to, the operation and conduct of the business of the Acquired Companies as currently conducted.

(b)	To the knowledge of the Sellers, the Acquired Companies have taken all reasonable steps that they believe are necessary to maintain and protect their right, title and interest in and to such Intellectual Property. . . .

(e) The representations and warranties in this Section 3.10 are the sole and exclusive representations and warranties of the Sellers concerning Intellectual Property.

**Section 8.4 Entire Agreement**

This Agreement together with the Sellers Disclosure Schedule and the Transaction Documents contains the entire understanding of the parties hereto with respect to the subject matter contained herein and supersedes all prior agreements, covenants, representations, warranties and understandings, oral and written, with respect thereto.

**Section 8.15 Injunctive Relief**

The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this

---

[110]	JTX 186, at FFN0010283-10304; Tr. 29-30 (Buckheit).

[111]	JTX 186, at FFN0010257-10282; Tr. 29-30 (Buckheit).

21

Agreement were not performed in accordance with their specific terms. It is accordingly agreed that the parties hereto shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to seek to specifically enforce the terms hereof . . .

*"**Intellectual Property**"* means any of the following: (a) All registered and unregistered trademarks, service marks, trade names, trade styles and pending trademark and service mark registration applications, including intent-to-use registration applications; (b) all registered and unregistered copyrights and applications for registration thereof; (c) all domestic and foreign patents and patent applications, (d) all Internet domain names, (e) all trade secrets and (f) all graphic representations and logos associated with Acquired Companies.[112]

### 7. Post-closing occurrences

#### a. Penthouse focuses on the domain lists

On February 29, 2016, Don Guarnieri, Penthouse's digital media manager, asked if Fox had a list of acquired domains.[113] Fox replied, "No list. I was just chatting with Andrey @ FFN about it. We're both ready to go but neither of us have an authoritative list of domains to work against. FWIW I've been asking Kelly for that domain list for 3 weeks now."[114] Later that day, Belous sent a domain list to

---

[112] JX 186, Annex 1-Definitions, at FFN0010236.

[113] JTX 196; Tr. 498 (Holland).

[114] JTX 196.

Guarnieri as an attachment to an e-mail titled "List of Sites," and Guarnieri forwarded this on to Fox.[115]

On March 1, 2016, Fox e-mailed Holland, Belous, and Guarnieri and asked, "Where is the rest of the list btw.  What I received from Don only contains penthouse and danni related names.  I thought someone had gone through their list of 4k+ names and cherry picked a bunch of them? What happened to all those, is there a more complete list?"[116]  Holland replied, ". . .Within the data room and as part of the sale process I've had access to the 'Penthouse' asset list but I have never had the complete FFN list.  I can request it, they can object, before I put it on their radar do we have it from another source."[117]  Fox then sent a link to the "complete FFN list" and suggested that they "[d]ownload the entire list while you still have network access."[118]  Guarnieri replied, "Got it."[119]  Later that day Guarnieri e-mailed Holland stating he had the "list from [Belous] that was labeled WEBSITE LIST – Question 4.A[.] Hotbox.com and .net are on the list.  Only domain missing that I was hoping

---

[115]     JTX 195.

[116]     JTX 201.

[117]     *Id.*

[118]     *Id.*

[119]     *Id.*

to get was hornywife.com[.] Also have access to FFN big list of domains and downloaded the entire 4,000+ list for anything else that looks good."[120]

### b. A new list is created with the Disputed Domains

On March 3, 2016, Guarnieri sent an e-mail titled "additional domains to be transferred to PGMI" to Holland and Slaughter with an attached list of 145 additional domains, which included eight of the Disputed Domains, excluding bookofsex.[121] On March 7, Guarnieri sent an updated list to Holland and Fox where he removed photofriendfinder from the list but added other names to the list. This list included all nine Disputed Domains.[122]

On March 4, 2016, Fox e-mailed Ballou to update her on the progress of the transition. In regards to domains, he said, "This is a job to get started next week. I'll be working closely with Andrey to transfer the domains of primary importance in small batches, and the less important ones in larger batches. This task will take some time but will be steady progress once we begin."[123]

---

[120]    JTX 198.

[121]    JTX 202.

[122]    JTX 206.

[123]    JTX 204.

On March 18, 2016, Holland e-mailed Ballou, Shashoua, and Belous a list of additional domains that "are part of Penthouse and Danni's."[124] The list included all nine Disputed Domains (the "March 18 List"). Ballou replied that she would review the list with Andrey "and revert back."[125]

Three days later, Ballou asked Holland where she found the list and said:

> I'm just a few URL's in and I see some that are not PH- ie bondage.com, Streamray.com etc. while others that are clearly PH and some that were already listed on the SmartRoom URL lists (Variations URL's for example)
>
> I am going to have all of the ownerships checked but if you can tell me where you sourced it – it might be easier.[126]

Ballou then asked Kam Miller, an employee in the IT department, to check the domain registration records and find the registrant of each domain.[127] Miller sent a list of the domains with the registrants and bolded the domains that were not registered to an Acquired Company.[128] All nine Disputed Domains appear on Miller's list and are categorized as FriendFinder domains.[129]

---

[124] JTX 210.

[125] JTX 211.

[126] JTX 213.

[127] Tr. 272 (Ballou).

[128] *Id.* at 272-76; JTX 4.

[129] JTX 4.

On March 26, 2016, Belous e-mailed Ballou regarding the source of the list and said Holland "got this list from the FFN master list as many of these names contain 'pet' and other PH marks, they should fall under the category of Penthouse sites."[130] Ballou replied that they "had id'd all ownership of URL's on the list and will add all the PH ones to the transfer list," but Ballou did not identify or otherwise share the transfer list referenced in her e-mail.[131]

Holland also e-mailed Ballou on March 24, explaining that "[t]he individual girl sites are Dannis. This is the launch of Horny Wife in 1999" and attaching a January 1999 cover of Penthouse magazine on which a story regarding hornywife.com is prominently featured.[132] Ballou replied that they were "going to go by WhoIs ownership. Hornywife.com is owned by Various. The final approved list has already been sent to our IT department for inclusion in the original 6 lists that were in the SmartRoom."[133] Holland replied, "With all due respect that means nothing at all because Various transferred URL's when we bought it. That has, since 1999, been a Penthouse site."[134] Belous then sent Holland a link showing that in

---

[130]   JTX 217.

[131]   *Id.*

[132]   JTX 216.

[133]   *Id.*

[134]   JTX 221.

26

2005 the hornywife website was redirected to penthouse.com.[135] Holland forwarded this along to Shashoua, Ballou, Guarnieri, and Slaughter.[136] Ballou responded, "Where is [hornywife] directed now?"[137]

On April 25, 2016, Guarnieri sent a list of 1,193 domains, including the Disputed Domains, to Fox and Holland, and stated "[o]bviously there are some domains FFN will not transfer."[138] The next day he sent an updated list.[139] He removed the domains that "were clearly FFN" and stated that he believed Penthouse had "a claim on all of the domains listed."[140] Holland responded to this stating that six domains on the list were "seemingly, not ours": sexy-panty-hose-pictures.com, sexydealfinder.com, sexyflashdeals.com, photobookofsex.com, and singlesofturkey.com.[141] Guarnieri answered that he had removed these domains and that they were copied in by mistake.[142] Belous provided the WhoIs information for

---

[135]    *Id.*

[136]    *Id.*

[137]    JTX 222.

[138]    JTX 231.

[139]    JTX 240.

[140]    *Id.*

[141]    JTX 242.

[142]    *Id.*; JTX 243.

five of the domains, including photobookofsex, and said, "All owned by Various Inc. and registered on the same date in 2012."[143]

### c. Disputes arise

Beginning in March 2016, Penthouse disputed the amount it owed under the LVSA. By April 25, 2016, Buckheit gave the order to stop all work under the TSA, which included the domain transfers, because Penthouse had not paid its invoices under the LVSA. On April 25, 2016, he sent an e-mail to Fox, copying Ballou, Slaughter, Belous, Shashoua, and Holland saying "The ball is in your court."[144] Holland responded, "Actually, the ball is now in Hogan Lovell's court."[145] After various failed attempts to resolve the issue,[146] on April 26, 2016, Penthouse terminated the LVSA.[147] As part of the termination, Penthouse agreed to pay the corrected amount due less a 10% discount.[148]

On the same day, Slaughter forwarded an e-mail titled "Notice of Breach" to Buckheit and Shashoua with a letter attached from Hogan Lovells stating that

---

[143]  JTX 243.

[144]  JTX 232; JTX 239.

[145]  JTX 236.

[146]  JTX 232; JTX 238.

[147]  JTX 248.

[148]  *Id.*

28

FriendFinder had intentionally and willfully breached the TSA and demanding FriendFinder cease and desist its breach.[149]

### d. The April 28, 2016 e-mail

On April 28, 2016, Slaughter sent an e-mail addressed to Buckheit, but also included Shashoua, Ballou, Holland, Belous, Fox, Guarnieri, and Russ Cashdan (Penthouse's Hogan Lovells counsel) as recipients, as well as five other FriendFinder employees. He wrote in relevant part:

> FFN breached the TSA by improperly interrupting service without cause. Despite our notice, FFN by your personal instruction has intentionally failed to cure the breach thus damaging our ability to transition and operate. . . .
>
> As a courtesy and pursuant to the LVS agreement, we provided FFN 5 days to terminate. You personally and unilaterally choose to terminate the services ahead of the expiration of the notice. Furthermore, and to compound the matter, you attempted to deceive a Penthouse employee into entering an agreement binding Penthouse. . . .
>
> Attached please find a list of Penthouse assets that you personally, and other FFN employees have refused to provide in direct violation of the agreements between us.
>
> I will continue to work with the FFN staff directly to complete the transition, but please [be] advised: you are personally prohibited from contacting any Penthouse employee and all Penthouse personnel have been instructed not to accept or answer any further communication from you. . . .

---

[149]    JTX 245.

29

> FFN's breach of the TSA, and your personal behavior have caused, and continue to cause irreparable harm to Penthouse.[150]

This e-mail contained an attachment with a list of domain names that combined the Data Room Lists and the March 18 List (the "April 28 List").[151] The supplemented domains from the March 18 List were bolded, underlined, indented, colored in blue font, and marked as "Additional" to differentiate them from the original Data Room Lists.[152] The attachment also stated that only two of the domains on the list had been transferred to date and demanded that all the listed domains be transferred by May 2.[153]

> That night, Buckheit sent an initial e-mail and stated:

> Don,

> As I've said, I am your point of contact in our organization. If you have needs to address, you must do so directly with me. You have no reasonable basis to insist otherwise. My tendency not to necessarily agree with you is insufficient grounds to establish an alternative communication path.

> As for the TSA, services were resumed as soon as you wired the money.

---

[150]   JTX 251.

[151]   *Id.*

[152]   *Id.*

[153]   *Id.*

We have attempted to transfer some of the domains to you when you requested, but you were unable to accept them. This is documented and we can send you this documentation.[154]

The next day, Buckheit sent a second e-mail and stated in relevant part:

Pursuant to your demand that we transfer control of all domains on the list attached to your e-mail from yesterday evening by May 2, we are ready to do so, with the exception of your improper demand that we transfer control of stonerfriendfinder.us, which is not a domain that was purchased from FriendFinder Networks Inc.

Would you please let us know a time today (April 29) or Monday (May 1) that works for you to receive DNS control of all of these domains? Thereupon we will initiate the complete transfer at that time. . . .

Moving on the other demands in your letter, we disagree with your characterization that Penthouse has "repeatedly asked for these items since the close of escrow. In fact, we have direct documentation otherwise, that Penthouse asked we hold off on transferring the full list of domains when we stood ready to do so because of an express desire to do a few at a time. We also dispute any right you have under the TSA to set deadlines. As you know, the requirement is that FFN attend to these issues in the normal course of business.[155]

Ballou also sent an e-mail that day to Fox and various FriendFinder team members attaching Slaughter's list, which stated: "Here is the list the only URL we

---

[154]    JTX 340.

[155]    JTX 261.

31

are not transferring is stonerfriendfinder.us. Otherwise this is a final list."[156] Ballou admitted at trial that she was "under a lot of pressure at that time to wrap it up, to get it done, you know, to get the team moving on the continual transfer of domains, and I made a mistake. I didn't look carefully enough at the list."[157] Buckheit admitted at trial that he did not review the April 28 List.[158]

### e. The domain transfer and subsequent events

By May 2016, FriendFinder transferred substantially all of the domains on the April 28 List.[159] After continuing disagreements between the parties, Penthouse terminated the TSA on May 16, 2016.[160] The termination notice stated that the termination would be effective on May 31, 2016, and "[a]t such time, all property and assets of [Penthouse] or any of its subsidiaries (including the accounting records, intellectual property and other data and information), need to have been, or shall be, transferred" by FriendFinder to Penthouse.[161]

---

[156] JTX 255.

[157] Tr. 298-299 (Ballou).

[158] Tr. 41, 97-98 (Buckheit).

[159] JTX 253; JTX 255; JTX 259; JTX 271; JTX 274.

[160] JTX 282.

[161] *Id.*

By May 29, 2016, the Disputed Domains were being directed to penthouse.com.[162] On May 29, 2016, Penthouse began to receive emails from hornywife members inquiring why they were being redirected to penthouse.com.[163] Around this time, FriendFinder noticed a decline in revenue and was receiving complaints from affiliates that customers were having trouble logging in. Upon investigation, FriendFinder realized that hornywife and bookofsex were being redirected to penthouse.com.[164] FriendFinder employees attempted to identify the issue, and Buckheit expressed suspicions that the transfer of domains to Penthouse may be the issue.[165]

FriendFinder contacted Fox who stated that the redirection was intentional, as these websites were properties of Penthouse.[166] Buckheit responded, "How can these be properties of Penthouse? Were they transferred by mistake? They have

---

[162]    JTX 322.

[163]    JTX 289; JTX 288; JTX 287; Tr. 757 (Fox).

[164]    JTX 286; JTX 290.

[165]    JTX 308; Tr. 48 (Buckheit).

[166]    JTX 298.

nothing to do with Penthouse."[167] FriendFinder officers and employees then reviewed the April 28 List and realized that it contained these domains.[168]

The next day, Ballou e-mailed Fox regarding hornywife and bookofsex stating that they were being directed at penthouse.com even though "the Whois data still shows Various as the owner and WayBack shows BookofSex clearly a cams.com co-brand as of March 9th. Same thing for Hornywife.com."[169] Ballou then contacted Penthouse's outside counsel at Hogan Lovells and demanded that Penthouse "unlock and return these domains to Various Inc. at once as their refusal to do so since they have been notified has caused and will continue to cause irreparable damage as our customers are being redirected away to penthouse.com."[170] Ballou also asked Belous to instruct Fox to redirect the websites to FriendFinder as a "temp solution."[171] Buckheit spoke with Fox during this time, stating that a mistake had been made in the transfer, and Fox redirected the websites to FriendFinder servers that same day.[172]

---

[167]    *Id.*

[168]    *Id.*

[169]    JTX 294.

[170]    JTX 302.

[171]    JTX 293.

[172]    JTX 295; Tr. 50-51 (Buckheit).

34

Over the next few days, Ballou sent Penthouse's counsel documents attempting to show Various's ownership of hornywife and bookofsex. This included: (1) a WhoIs report for hornywife showing Various as the owner; (2) screenshots from January 2016, March 2015, and September 2011 of hornywife showing Various in the footer and the website as a co-brand for AdultFriendFinder; (3) a Sample Medly Insertion Order listing hornywife as a co-brand of AdultFriendFinder; (4) a WhoIs report for boob-squad.com showing Various as the owner; and (5) a Various letter showing intent to purchase the boob-squad.com domain portfolio in 2009.[173]

Meanwhile, Holland requested WhoIs information on the Disputed Domains from a Penthouse contractor, Lucky Smith.[174] Smith answered:

---

[173] JTX 307.

[174] JTX 306. Penthouse objects to the use of JTX 306 and JTX 311 on hearsay grounds. These documents, however, fall under an exception to the hearsay rule as they are "Records of Regularly Conducted Activity." *See* D.R.E. 803(6) ("A memorandum, report, record or data compilation, in any form, of acts events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . ."). "In order to be a qualified witness, the witness 'need only have knowledge of the procedures under which the records were created'" and

> must attest to the following foundational requirements of Rule 803(6): '(1) that the declarant in the records had knowledge to make accurate statements; (2) that the declarant recorded statements contemporaneously with the actions which were the

35

Short answer: Boob-Squad.us looks like the only easy argument. Long answer pasted below. . . .

**Boob-squad.us** – DANNI (2003)

**Boobfarm.com** – ARS early, continued as a mere feeder site in current state. Not indexed since 2008, so we know nothing has changed. Not sure how this got on your list. See no references to Danni, FFN or PH anywhere.

**Misslilizz.com** – can't find anywhere. Shows available on NetSol, so maybe I'm spelling it wrong. . . .

**Nakedfemalebodybuilder** – started as sexhit by 2005 was a pure feeder site same in 2007 looks to have gone offline in Jan 2014 NetSol says FFN owns it since 2004

---

subject of the reports; (3) that the declarant made the record in the regular course of business activity; and (4) that such records were regularly kept by the business.'

*McCoy v. State*, 89 A.3d 477 (Del. 2014)(TABLE) (quoting *Palomino v. State*, 2011 WL 2552603, at *3 (Del. Super. Apr. 4, 2011)) (citing *Trawick v. State*, 845 A.2d 505, 509-09 (Del. 2004)). At trial Holland testified that Smith was a digital consultant and a content manager for Penthouse. Tr. 548. Belous testified that, as general counsel and senior vice president of Penthouse, she regularly addressed issues of intellectual property concerning assets of the company, regularly sent e-mails to outside vendors like Kavanagh as part of that work, and kept records of those e-mails. Tr. 688. Belous and Holland both sought information regarding Penthouse's ownership of certain domain names from reputable sources in their capacities as managers of the company. Furthermore, Smith and Kavanagh could be considered agents or servants of Penthouse in researching this information on behalf of Holland and Belous. *See* D.R.E. 801(d)(2) (a statement is not hearsay if it is offered against a party and is a statement by her agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship). Finally, these documents also are admissible to test the credibility of Holland and Belous as to their testimony that WhoIs data is not reliable to determine ownership of domain names. *See* D.R.E. 801(d)(1) (a statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination and the statement is inconsistent with her testimony).

**Photobookofsex.com** Various set up in May of 2011. Never did anything with it. No archives.

**Photogalleryofsex.com** Same. No Archives. Also Various, May 2011 setup.[175]

On June 1, 2016, Belous e-mailed Edward Kavanagh of CSC to find out information on hornywife and boob-squad.us.[176] Kavanagh told Belous that boob-squad.us was registered to Jason Quinlan in 2005, but in 2010, ConfirmID became the owner, using a FriendFinder email address of sa@ffn.com, and in 2016, it moved from ConfirmID to Various, using the FriendFinder e-mail of hostmaster@ffn.com.[177] Additionally, according to Kavanagh, the first hornywife record is from 2001, where it is registered to GMCI, and it stays listed this way until November 22, 2011, when it is changed to Various as the owner.[178]

Penthouse's counsel sent a letter to FriendFinder's counsel on June 3, 2016 asserting that the websites were not mistakenly transferred to Penthouse, but that representatives of both entities:

> heavily negotiated the list of websites to be transferred . . . over many weeks with the final List distributed by Diana Ballou . . . in an e-mail . . . on which not one, not two, not three but 6 other [FriendFinder] addressees were copied.

---

[175]   JTX 306.

[176]   JTX 311.

[177]   *Id.*

[178]   *Id.*

All of the Nine Websites were included in the final List distributed by Ms. Ballou in the April Email.[179]

## C.    Procedural History

On June 8, 2016, FriendFinder filed this action seeking a declaratory judgment as to FriendFinder's ownership of the Disputed Domains and injunctive relief against Penthouse ordering the restoration of control over the Disputed Domains to FriendFinder.  The complaint also asserts that Penthouse unlawfully converted the Disputed Domains.

On June 28, 2016, Penthouse filed its answer and counterclaims seeking its own declaratory judgment of ownership over the Disputed Domains and damages to compensate for the loss of the use of the Disputed Domains due to its voluntary agreement to redirect the domains to FriendFinder websites during the course of this action.  On June 30, 2016, the parties stipulated to and this Court entered a status quo order ("Status Quo Order") mandating that Penthouse redirect all Disputed Domains to FriendFinder, cooperate with any regulatory or legal obligations or any reasonable requests from FriendFinder regarding the Disputed Domains, and refrain from changing the source code or user interface of the Disputed Domains or interfering with FriendFinder's placement of advertising or receipt of advertising revenue from the Disputed Domains.  Under the Status Quo Order, FriendFinder was

---

[179]    JTX 316.

38

ordered to continue paying the domain registration fees and to provide a figure representing the gross, unaudited revenue for the Disptued Domains on the first of every month from August-November 2016. This Court held trial on November 30, December 1, and December 2, 2016, and post-trial argument, fittingly for this case, was held on February 14, 2017.

## II.    ANALYSIS

FriendFinder brings this action asserting that Penthouse did not acquire the Disputed Domains under the SPA or any other agreement because these domains were not material to the Penthouse business as it was conducted immediately prior to the transaction. Thus, FriendFinder argues, Penthouse has converted the Disputed Domains, and FriendFinder is entitled to an injunction restoring the Disputed Domains to FriendFinder.

Penthouse claims the parties reached two separate, valid, binding agreements in February and April that unequivocally grant the Disputed Domains to Penthouse. Thus, Penthouse did not convert the Disputed Domains, and Penthouse seeks damages to compensate for revenue lost during the pendency of this litigation while the websites were redirected to FriendFinder.

## A. The SPA Governs the Rights to the Disputed Domains

This Court is "[g]uided by 'Delaware's well-understood principles of contract interpretation.'"[180] "Under general principles of contract law, a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless."[181] "In a dispute involving contract interpretation, the court must first examine the entire agreement to determine whether the parties' intent can be discerned from the express words used, or alternatively, whether its terms are ambiguous."[182] "If the terms of the contract are 'clear on their face, . . . the court must apply the meaning that would be ascribed to the language by a reasonable third party.'"[183] "Ambiguity does not exist simply because the parties disagree about what the contract means."[184] "Rather, contracts are ambiguous 'when the provisions in

---

[180] *United Rentals, Inc. v. Ram Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007) (quoting *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007).

[181] *Sonitrol Hldg. Co., v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 2012).

[182] *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. Sept. 4, 2003).

[183] *Id.* (quoting *True North Commc'ns, Inc. v. Publicis, S.A.*, 711 A.2d 34, 38 (Del. Ch. 1997)).

[184] *United Rentals, Inc.*, 937 A.2d at 830 (citing *Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996); *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *2 (Del. Ch. Nov. 8, 2007)).

controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.'"[185]

The parties do not argue that there exists any ambiguity in any contract created. Instead, they dispute which contract (the SPA) or purported contract (the February or April e-mails) governs the dispute. Section 3.10(a) of the SPA provides that "the Acquired Companies own or otherwise have the right to use all Intellectual Property that is used in, and is material to, the operation and conduct of the business of the Acquired Companies as currently conducted."[186] The definition of "Intellectual Property" expressly includes domain names. It provides as follows:

---

[185] *Id.* (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

[186] JTX 186 ¶ 3.10(a). Penthouse argues that Section 3.10 expired at closing under Section 7.1 of the SPA, which provides: "The respective representations and warranties of Sellers and Buyer contained in Article III and Article IV . . . shall terminate and be of no further force or effect as of the Closing Date . . ." Def.'s Opening Br. 38 n. 34; JTX 186, at 23. FriendFinder responds by pointing to Section 5.10, entitled "Further Assurances," which states: "Buyer and Sellers shall each . . . take such further action as may be reasonably required or desirable to carry out the provisions of this Agreement and to consummate the transactions contemplated hereby. Upon the terms and subject to the conditions of this Agreement, Buyer and Sellers shall each use its commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done all other things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement . . ." JTX 186, at 19; Pl.'s Answering Br. 20. I need not decide this, however, because as discussed below, the parties' subsequent conduct evidences their intent to continue operating under the test set out in the SPA—to only transfer those domains that were Penthouse assets at the time of closing.

41

(a) All registered and unregistered trademarks, service marks, trade names, trade styles and pending trademark and service mark registration applications, including intent-to-use registration applications; (b) all registered and unregistered copyrights and applications for registration thereof; (c) all domestic and foreign patents and patent applications, (d) all Internet domain names, (e) all trade secrets and (f) all graphic representations and logos associated with Acquired Companies.[187]

Thus, the SPA anticipates that Penthouse has the right to domain names that were "used in, and [] material to, the operation and conduct of the business of the Acquired Companies" at the time of closing.[188] Further, items (c)-(f) in the definition of Intellectual Property are all separated by commas, suggesting that the phrase "associated with Acquired Companies" applies to items (c)-(f). The phrase necessarily must apply to the preceding items, because if not, there is no limitation on the broad categories. This would lead to an absurd result that would "conflict[] with the agreement's overall scheme."[189] Additionally, the application of the phrase "associated with Acquired Companies" to the broad categories listed in the definition of Intellectual Property is consistent with the limitation already expressed in Section 3.10—that the relevant Intellectual Property is that which is "used in, and

---

[187]    JX 186, Annex 1-Definitions, at FFN0010236.

[188]    JX 186, Annex 1-Definitions, at FFN0010236.

[189]    *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013) (citing *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

42

[] material to, the operation and conduct of the business of the Acquired Companies as currently conducted."[190] Reading these two sections together, the SPA provides for a guiding principle in determining which domain names should be transferred to Penthouse—only those domains that were associated with, used in, or material to the Penthouse business at the time of closing.[191]

## B. No Prior or Subsequent Contract Was Created

Penthouse argues that the SPA is irrelevant because the February e-mail exchange and the April e-mail exchange create valid, binding, and enforceable contracts to transfer the Disputed Domains.[192] But, an examination of those e-mails and the parties' conduct reveals the parties intended to operate under the SPA's guidance, proceeded to operate under the SPA's test, and understood the SPA to grant Penthouse *only those assets* that were associated with, material to, or used in the Penthouse business at the time of closing.

From the beginning, Holland was only interested in those websites that belonged to Penthouse. In June 2014, Fox asked Canny to "generate a list of all

---

[190]   JX 186, Annex 1-Definitions, at FFN0010236.

[191]   While neither party argues that the language of the SPA is ambiguous, I recognize the potential for a conflict between the three categories listed. But, no conflict exists here because, as discussed *infra*, none of the Disputed Domains meets any of the three classifications at the time of closing. *See* Section II.C.

[192]   Def.'s Opening Br. 34.

43

GMCI domains we own[.] Kelly is interested in what we have."[193]  On February 15,

days before the closing, Holland e-mailed Shashoua and Ballou to express her

concern that Penthouse domains that didn't specifically have Penthouse embedded

in the name were not easily identified.[194]  In this same e-mail, she asserted that

hornywife "was a Penthouse site back in the Guccione days."[195]  Ballou responded

by asking Holland to prepare a list of all the websites Holland believed "are part of

the business that are not listed" for FriendFinder's review.[196]  Holland agreed.[197]

After the closing, both sides continued operating with the understanding that

Penthouse was only entitled to those websites that were part of the Penthouse

business.  On March 18, Holland e-mailed Ballou, Shashoua, and Belous the March

18 List with all of the Disputed Domains included.[198]  Ballou replied that she would

review the list and revert back.[199]  On March 21, Ballou responded that while there

were certain domains that were clearly Penthouse-related, she saw some domain

---

[193]    JTX 98; JTX 99.

[194]    JTX 179.

[195]    *Id.*

[196]    JTX 180.

[197]    JTX 182.

[198]    JTX 210.

[199]    JTX 211.

names that were clearly not Penthouse-related such as bondage.com and streamray.com, and she would "have all of the ownerships checked."[200] Holland did not challenge those two domains or Ballou's plan to check ownerships. Instead, she provided evidence of Penthouse's ownership of certain domains she believed belonged to Penthouse. On March 24, Holland stated that the "individual girl sites" are associated with dannis.com, a Penthouse website, and hornywife was launched in 1999 before the original Penthouse/FriendFinder merger by being featured prominently in Penthouse Magazine.[201] Ballou responded that FriendFinder would rely on WhoIs ownership, and hornywife belongs to FriendFinder because it is registered to Various.[202] Holland replied by providing further arguments regarding hornywife's association with Penthouse. She explained that WhoIs "means nothing at all because Various transferred URL's when we bought it. [Hornywife] has, since 1999, been a Penthouse site."[203] Holland sent a link from 2005 showing hornywife being directed to penthouse.com to Shashoua, Ballou, Guarnieri, and Slaughter.[204]

---

[200]  JTX 213.

[201]  JTX 216.

[202]  *Id.*

[203]  JTX 221.

[204]  *Id.*

Ballou responded by asking "Where is [hornywife] directed now?"[205]  Although the parties may have disagreed about whether hornywife was a Penthouse website, both parties understood that it necessarily must be associated with Penthouse in order to be transferred in the transaction.

In fact, when there was any indication that Penthouse would receive websites not associated with the Penthouse business, Holland corrected the mistake.  When Fox e-mailed Holland that Penthouse should take ownership of the entire penthouse2010 GoDaddy account and that "slid[ing] this one past Diana" would be "nothing short of an awesome heist,"[206] Holland testified that she didn't fully understand at the time of the e-mail what the penthouse2010 account was and that she "didn't like the use of the term 'heist.'"[207]  Holland told Tom that she did not want to take ownership of any domains that did not belong to Penthouse on a technicality.[208]  And Penthouse never made any effort to take control of that account.[209]

---

[205]    JTX 222.

[206]    JTX 190.

[207]    Tr. 497-98.

[208]    *Id.* at 497-98, 575.

[209]    *Id.* at 575.

In the same vein, when Guarnieri sent a list with the Disputed Domains to Fox and Holland on April 26, Holland responded that six domains on the list were "seemingly, not" Penthouse's: sexy-panty-hose-pictures.com, sexydealfinder.com, sexyflashdeals.com, photobookofsex.com, and singlesofturkey.com.[210] Guarnieri told her these domains were listed by mistake, and he would remove them.[211] Belous responded by providing WhoIs information for five of the domains, including photobookofsex, stating they were all owned by Various and were registered on the same day in 2012.[212]

Once the domains had been transferred, and FriendFinder noticed a decline in revenue and was notified of complaints from customers, Buckheit asked Fox "How can these be properties of Penthouse? Were they transferred by mistake? They have nothing to do with Penthouse?"[213] Ballou contacted Fox and stated that a WayBack search shows bookofsex and hornywife as clearly a cams.com co-brand and the

---

[210]    JX 242.

[211]    JTX 242; JTX 243.

[212]    JTX 243.

[213]    JTX 298.

WhoIs data shows Various as the owner.[214] Ballou then sent Penthouse's counsel documents attempting to show the true ownership of the websites.[215]

During this time, Holland and Belous also obtained the WhoIs information for the Disputed Domains from outside contractors. Holland learned that boob-squad.us was a danni-related website in 2003; photobookofsex and photogalleryofsex were set up by Various in 2011; boobfarm had not been indexed since 2008; and nakedfemalebodybuilder had been owned by FriendFinder since 2014.[216] Belous, meanwhile, was told that boob-squad.us was registered to ConfirmID in 2010, then registered to Various in 2016, both with FriendFinder e-mail addresses, and hornywife had been registered to Various since 2011.[217]

Contrary to Penthouse's arguments, the evidence reveals that Penthouse had no intent to and did not enter into any separate contracts with respect to the domain names that would be transferred to Penthouse. At all relevant times, both sides were operating with the understanding that the SPA required FriendFinder to transfer domain names to Penthouse and provided clear guidance for identifying the appropriate domains to be transferred—Penthouse is only entitled to those domains

---

[214]   JTX 294.

[215]   JTX 307.

[216]   JTX 306.

[217]   JTX 311.

associated with, material to, or used in the Penthouse business at the time of closing.[218]

## C.   Penthouse is Not Entitled to the Disputed Domains under the SPA

Having established that the parties understood the transaction to contemplate only those domains that were associated with, material to, or used in the Penthouse business at the time of closing, I now turn to whether any of the Disputed Domains fall under this description by examining multiple "indicia of ownership" used by experts in the field.

The first indicator of ownership is the WhoIs data regarding registration. Penthouse argues that WhoIs data is not reliable because (1) this information is not kept up to date; (2) the various entities' website registration became commingled during the initial Various/Penthouse merger; and (3) FriendFinder "homogenized" the domain registration to Various for all the websites.[219]  But, this argument fails because, as discussed above, Penthouse representatives themselves turned to WhoIs

---

[218]   Penthouse's argument that the parties entered into a different contract suffers from other infirmities.  "The elements necessary to prove the existence of an enforceable contract are: (1) the intent of the parties to be bound, (2) sufficiently definite terms, and (3) consideration."  *Otto v. Gore*, 45 A.3d 120, 138 (Del. 2012) (citing *Gallagher v. E.I. DuPont De Nemours & Co.*, 2010 WL 1854131, at *3 (Del. Super. Apr. 30, 2010)).  Penthouse has not put forth any evidence that the parties intended to create another agreement beyond the SPA.  Additionally, it is unclear what consideration was exchanged for any purported contract.

[219]   Def.'s Opening Br. 7, 25 n.25.

information at numerous times throughout the process to determine the ownership of the websites.[220] Also, while Penthouse did provide evidence that there may have been discrepancies and commingling that resulted in certain Penthouse-associated websites being registered to Various,[221] Penthouse did not suggest that the registrant information was wrong for any of the Disputed Domains, except perhaps hornywife.[222]

The WhoIs data for all the Disputed Domains suggests that they were associated with the FriendFinder business at the time of closing. All of the contested websites, except hornywife, were purchased by FriendFinder entities after the 2007 merger of Penthouse and Various. ConfirmID purchased nakedfemalebodybuilder, nakedwithfood, boobfarm, and boob-squad in 2009; FriendFinder purchased bookofsex and created photobookofsex in 2011 after the Facebook litigation.[223] Bookofsex has been registered to Various since 2011; photobookofsex and photogalleryofsex were registered to FriendFinder in 2011 and then Various in 2013; nakedfemalebodybuilder, nakedwithfood, boobfarm, and boob-squad have been registered to ConfirmID since 2012; and missblizz has been registered to Host

---

[220]    *See* JTX 179; JTX 243; JTX 306; JTX 311; *see supra* Section II.B.

[221]    Def.'s Opening Br. 14 n.15; Tr. 499-501 (Holland).

[222]    *Cf.* JTX 4; JTX 251.

[223]    JTX 334.

Master, a default FriendFinder account, since 2014.[224] Penthouse has not presented any evidence that these domains were ever registered to or owned by a Penthouse-affiliated business or entity. Hornywife, however, was registered to GMCI, a Penthouse-associated business, from at least 2001 until 2011.[225] But, in 2011, hornywife's registrant changed to Various and has remained registered to Various since that time.[226]

The second indicator of ownership is the websites' historical use. The inactive websites, except boobfarm, have had no activity since 2012.[227] Boobfarm has directed traffic to other FriendFinder-associated websites since at least 2013.[228] Bookofsex has been maintained as an AdultFriendFinder co-brand since 2011, and its copyright and terms of use show Various as the owner since that time.[229] Bookofsex's Splash Page represents its particular theme; however, when the user logs in, the content is nearly identical to the other AdultFriendFinder co-brands.[230]

---

[224] *Id.*

[225] *Id.*

[226] *Id.*

[227] Tr. 405-09 (Palage).

[228] *Id.*

[229] JTX 5; Tr. 125-26, 144, 162-63 (Shashoua).

[230] JTX 334, Exs. 2-3.

51

Hornywife is the exception in terms of historical use because from 2005 until 2011, hornywife was directed to penthouse.com.[231] In 2011, however, hornywife became an AdultFriendFinder co-brand, and its Splash Page listed Various as the copyright owner.[232] Similarly to bookofsex, although hornywife has a unique Splash Page, once the user logs in, its content is identical to other AdultFriendFinder co-brands.[233] Penthouse does not provide any evidence to the contrary or argue that these websites were used by Penthouse at the time of closing.

The third and final indicator of ownership is the financing and accounting for the websites. Bookofsex has been financed completely by Various since 2011, and Various has recognized revenue for the website since 2011.[234] Various also paid affiliates, advertising costs, and search engine optimization costs for hornywife, and it recognized the revenue from hornywife since 2011.[235] Additionally, the internal coding cheat sheet, received by Penthouse management, delineated the expenses and revenues within the FriendFinder organization and grouped hornywife and

---

[231] JTX 334.

[232] *Id.*

[233] JTX 334, Exs. 2-3.

[234] JTX 5; Tr. 125-26, 144, 162-63 (Shashoua).

[235] JTX 6; Tr. 155-161 (Shashoua), 398 (Palage).

bookofsex in the Casual Dating Silo under AdultFriendFinder.[236]  The back-end

acronym assigned to both hornywife and bookofsex was "Ffadult," in line with other

AdultFriendFinder co-brands.[237]  Penthouse did not present any evidence that any of

the Acquired Companies recognized revenue or incurred any costs associated with

hornywife or the other Disputed Domains at the time of closing.

Although hornywife's pre-2011 WhoIs records and use may leave some doubt

as to its proper ownership, the post-2011 WhoIs records, use, and financing make

clear that hornywife, like the other Disputed Domains, was not associated with, used

in, or material to the Penthouse business at the time of closing, and the SPA does not

contemplate its transfer to Penthouse.  The indicia point to FriendFinder's ownership

of all the Disputed Domains.[238]

### D.      FriendFinder is Entitled to the Return of the Disputed Domains

Because FriendFinder is the rightful owner of the Disputed Domains under

the SPA, Penthouse must return the domains to FriendFinder.  Penthouse argues that

FriendFinder is not entitled this "extraordinary remedy" because FriendFinder has

---

[236]    JTX 76.

[237]    JTX 76.

[238]    Because I find that no agreement was formed and that the SPA controls, I need not analyze FriendFinder's mistake defenses or its request for reformation.

53

not met the elements required for a mandatory injunction.[239] "To issue a mandatory injunction requiring a party to take affirmative action . . . the Court of Chancery must either hold a trial and make findings of fact, or base an injunction solely on undisputed facts."[240] "The Court will only award a mandatory injunction in a clear case, free from doubt."[241] In order for a movant to be entitled to a permanent injunction, the movant must show "(1) actual success on the merits; (2) irreparable harm; and (3) the harm resulting from failure to issue an injunction outweighs the harm befalling the opposing party if the injunction is issued."[242] As discussed above, after trial, FriendFinder has proven actual success on the merits because it has shown that it rightfully owns the Disputed Domains.

Penthouse argues that FriendFinder cannot demonstrate irreparable harm because (1) Section 8.15 of the SPA does not apply; (2) even if Section 8.15 of the SPA does apply, it does not require an injunction; and (3) money damages can

---

[239] Def.'s Pre-Trial Br. 44-47; Def.'s Opening Br. 50-51.

[240] *C&J Energy Servs., Inc. v. City of Miami Gen. Empls.' Ret. Trust*, 107 A.3d 1049, 1071 (Del. 2014).

[241] *ID Biomed. Corp. v. TM Techs., Inc.*, 1995 WL 130743, at *16 (Del. Ch. Mar. 16, 1995) (citing *Video of Delaware, Inc. v. Silver Screen Video, Inc.*, 1984 WL 198609, at *1 (Del. Ch. Dec. 28, 1984)).

[242] *Id.* at *15 (citing *Draper Commc'ns, Inc. v. Delaware Valley Broads., L.P.*, 505 A.2d 1283, 1288 (Del. Ch. 1985)).

adequately compensate FriendFinder for the Disputed Domains.[243]  Because I find

that the SPA is the governing document, Section 8.15 does apply.  Section 8.15,

entitled "Injunctive Relief" states that the parties agree that irreparable harm will

result if any provision of the SPA is not performed as specified and that the parties

are able to seek an injunction to specifically enforce the terms of the agreement.[244]

Although Penthouse is right that the injunction is not *required* under the SPA, I still

retain my discretion to grant the remedy.  These domain names are assets and

property of FriendFinder, and under these circumstances, damages would not

adequately compensate FriendFinder for its losses.

Finally, Penthouse argues the balance of the equities does not favor

FriendFinder because FriendFinder's own actions caused Penthouse to take

possession of the Disputed Domains.[245]  While this may be the case, this does not

prevent the Court from recognizing that allowing assets that are rightfully

FriendFinder's to remain in the custody and control of Penthouse will harm

FriendFinder more than taking those domains that were not Penthouse's at the time

---

[243]    Def.'s Pre-Trial Br. 45-46.

[244]    JTX 186, § 8.15.

[245]    Def.'s Pre-Trial Br. 47.

of closing away from Penthouse. I find that FriendFinder is entitled to an injunction enforcing the return of the Disputed Domains against Penthouse.[246]

## III. CONCLUSION

For the foregoing reasons, I find that the SPA controls and provides for the transfer of domain names that are associated with, used in, or material to the Penthouse business at the time of closing. FriendFinder has shown that under the SPA, the Disputed Domains were associated with, used in, or material to the FriendFinder business at the time of closing. Penthouse has not put forth any evidence that it is entitled to any of the Disputed Domains under the SPA. Therefore, I order Penthouse to turn over all the Disputed Domains to FriendFinder within 10 days of this opinion.

**IT IS SO ORDERED**.

---

[246] FriendFinder asserts that Penthouse converted FriendFinder property. Pl.'s Opening Br. 62. The complaint alleges that "[a]s a direct and proximate result of PGMI's wrongful control of the FFN Domains, FFN has suffered and/or will suffer damages and financial injury." Compl. ¶ 36. The relevant Disputed Domains were turned back to FriendFinder within a day of Penthouse being notified of the transfer. JTX 295. FriendFinder does not provide evidence of any damages or any further harm it suffered as a result of any purported conversion.